UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
BOWLING GREEN DIVISION
CASE NO. 1:06-CV-168

MARK THOMPSON                                                              PLAINTIFF

v.

QUORUM HEALTH RESOURCES, LLC                                 DEFENDANT

## MEMORANDUM OPINION AND ORDER

This matter is before the Court upon Plaintiff's Motion for Summary Judgment (Docket #89) and Defendant's Motion for Summary Judgment (Docket #87). Defendant has responded (Docket #94) and replied (Docket #96). Plaintiff has responded and replied (Docket #93). This matter is now ripe for adjudication. For the following reasons, Plaintiff's Motion for Summary Judgment is DENIED, and Defendant's Motion for Summary Judgment is DENIED.

## BACKGROUND

Plaintiff Mark Thompson was an employee of Defendant Quorum Health Resources, LLC ("QHR") from 1994 to 2006. He was first hired as the chief executive officer ("CEO") of Cumberland County Hospital in Burkesville, Kentucky, in 1994. In 1999, Thompson accepted the position of CEO at Monroe County Medical Center ("MCMC") in Tompkinsville, Kentucky. He worked there as an at will employee until he was terminated on July 28, 2006. QHR is a healthcare management company that contracts with independent hospitals' Boards of Trustees to provide hospital management services. QHR typically hires a CEO and chief financial officer ("CFO") to oversee the business and financial operations of those hospitals. The CEO and CFO are accountable to QHR, the Board, and the hospital.

Each year, QHR employees signed an acknowledgment stating they agreed to comply

with the QHR Code of Conduct.  When QHR was acquired by an affiliate of Triad Hospitals, Inc. ("Triad") in 2002, employees were provided with a similar Code of Conduct and asked to sign an acknowledgment annually.  From 1999 to 2004, Thompson signed annual acknowledgments which stated that he had read the Code of Conduct and reported any and all activity required by the Code.  The 2002 and 2004 acknowledgments contained the following language:

> I agree to fully comply with the standards, policies, procedures and other provisions of Triad's Code of Conduct.
>
> I understand the provisions of Triad's Code of Conduct are mandatory, and that compliance with the standards, policies, procedures and other provisions contained in Triad's Code of Conduct is a condition of my continued employment or association with Triad.

The Triad Code of Conduct features a section on "The Corporate Compliance Program" in which each employee is expected to report activity "that appears to violate applicable laws, rules, regulations, Triad's policies or this Code."  Employees may report such activity through supervisors, other personnel, or a toll-free anonymous hotline.  The Code also prohibits retaliation for making such reports.  The Code states in its "Questions and Answers" section that "employees may be subject to discipline if they witness something but do not report it to the company."

While serving as CEO of MCMC, Thompson grew concerned over QHR's control of decisions normally reserved to hospital boards, including the selection of vendors.  Thompson believed that QHR chose vendors that would benefit QHR, while increasing costs for the individual hospitals.  In 2001, QHR made the decision to change the Group Purchasing Organization for the hospital from Premier to Healthtrust Purchasing Group.  Thompson

questioned QHR's assertions that the hospital would save significant amounts of money.

Thompson began to collect documents in an effort to support his theories of fraudulent conduct by QHR.  In 2002, Thompson attempted to call the anonymous hotline, but was told that he must report which hospital he was from for documentation purposes.  Thompson was concerned this would reveal his identity, so he ended the call.  Instead, Thompson sought the advice of attorney Greg Stivers, who suggested he look into a *qui tam* action.  After hiring a private attorney and speaking to federal authorities, Thompson filed a *qui tam* lawsuit, under seal, on January 14, 2004.  He did not inform MCMC or QHR that he filed this lawsuit.

On January 27, 2004, Thompson signed another acknowledgment stating he had read the Code of Conduct and agreed to comply with its terms.  In May of 2004, Thompson received an audit questionnaire from John Taylor of the accounting firm of Taylor Polson & Company.  Taylor's firm performed annual audits for MCMC, and routinely gave audit questionnaires to management personnel.  On August 4, 2004, Thompson returned the audit questionnaire to Taylor.  That questionnaire contained the following questions and answers:

> Q: Do you believe Monroe County Medical Center has controls and systems in place to prevent a significant fraud from occurring in the Organization?  If "No," please indicate the areas of weakness.
>
> A: No - Management Contract
>
> Q: Where do you believe the Organization is most vulnerable to significant fraud?
>
> A: Management Contract
>
> . . .
>
> Q: Many of the most recent financial statement frauds that have been publicized in the press have been committed by key financial personnel.  Do you have any reason to question the integrity of any of your financial personnel?

A: Yes

Q: Do you have any suspicions of fraud that you believe we should consider?

A: Yes

Thompson signed and dated the questionnaire and also noted that "I hope this issue will be handled direct and in confidence."

John Taylor met with Thompson and his attorney on August 22, 2004.  During that meeting, Thompson told Taylor his general concerns about the management contract, purchasing agreement, and the potential for fraud.  On September 2, 2004, Taylor put this information in a letter to MCMC's Finance Committee, and later met with the Finance Committee to discuss Thompson's concerns.  Taylor also notified Rickie Brown, MCMC's CFO.  Brown contacted Taylor Cook, Thompson's direct supervisor, who reported Thompson's audit questionnaire answers to QHR's compliance office.

Sometime between September 2, 2004, and November 1, 2004, Chris Kelly, QHR's Senior Counsel, and Joe Beck, QHR's Director of HR/Compliance, traveled to meet with Thompson in Tompkinsville, Kentucky.  Kelly reminded Thompson of his duties under the Code of Conduct, but Thompson would not answer any questions without his lawyer present.  On November 1, 2004, Kelly sent a letter to Thompson's attorney, Kent Westberry, demanding a meeting with Thompson by November 5, 2004, to discuss his answers to the audit questionnaire. The letter advised Thompson that if he was "unwilling or unable, for any reason, to meet with QHR and the Committee prior to this date and time, QHR will have no choice but to take whatever actions or steps it deems appropriate, and in its best interest, without the input or assistance of Mr. Thompson."  Westberry replied to Kelly on November 5, 2004:

4

> In response to your letter dated November 1, 2004, at this time we are unable to comply with your request to meet with our client, Mark Thompson. We anticipate being in a better position to meet with you sometime after November 18, 2004. In addition, please be advised that Mr. Thompson is a protected employee pursuant to 31 U.S.C. §3730(h). If any form of retaliation is visited upon Mr. Thompson by your company, we will not hesitate to file a claim under that statute.

The statute cited by Westberry, 31 U.S.C. § 3730(h), is the anti-retaliation provision of the False Claims Act.

Joe Beck wrote to Thompson on November 18, 2004. In that letter, he emphasized Thompson's obligations under the Code of Conduct. The letter also stated that "employees determined to have violated the Code are subject to disciplinary action, including, but not limited to, the termination of their employment." Beck demanded a meeting with Thompson on November 29, November 30, or December 1, 2004. This meeting never took place. On November 29, 2004, Kelly received a letter from William Campbell, Assistant United States Attorney, Western District of Kentucky. This letter informed QHR that Thompson had filed a *qui tam* lawsuit under the False Claims Act. Campbell offered to meet with Kelly to discuss the allegations, and stated that QHR should "consider taking steps to ensure that Mr. Thompson is not made subject of any retaliation on account of his status as relator."

QHR, through its attorneys Epstein Becker & Green, P.C., replied to Campbell's letter on December 15, 2004. The Epstein letter, as the parties have dubbed it, stated as follows with regards to retaliation:

> QHR believes that certain actions regarding Mr. Thompson's status with QHR are required of us that are unrelated to any "retaliation" by us. In fact, prior to receipt of your letter, QHR had reached a conclusion that discharge likely would be necessary based upon Mr. Thompson's refusal to comply with his reporting and disclosure obligations under QHR's compliance program.

. . .

[I]n light of your letter, and in the spirit of cooperation, QHR has decided it will not discharge Mr. Thompson at this time, but rather, will suspend Mr. Thompson with pay.

. . .

As is clear from the correspondence to Mr. Thompson from QHR, Mr. Thompson's failure to perform his basic job responsibilities and his insubordinate behavior have been of substantial concern to QHR for almost three months, well before QHR was made aware of the *qui tam* complaint, Mr. Thompson's status as a relator or his expectation of filing a False Claims Act case.

 . . .

QHR is aware of no other person with the company or within the Hospital who understands or knows what the alleged fraudulent behavior is, and it therefore has not been able to conduct its own investigation in the face of Mr. Thompson's failure to cooperate.  As is clear from the relevant correspondence, QHR has given Mr. Thompson numerous opportunities to fulfill his basic job responsibilities.  He did not do so.

The letter went on to explain more about Thompson's violations of the Code, his employment background with QHR, and his consistent refusal to meet with QHR officials.  The letter also requested a copy of the *qui tam* complaint.

On December 27, 2004, Thompson was suspended with pay.  The letter he received stated that the reason for his suspension as follows:

As you know Quorum Health Resources, LLC ("QHR") has repeatedly sought to obtain information from you relative to allegations you made to accountants associated with Monroe County Medical Center.  Despite QHR's efforts, you have refused to supply such information and have refused to meet with us to discuss the issues.

Consequently, this is to advise you that QHR has made the decision to suspend you, with pay, from your position as CEO of Monroe County Medical Center.  This decision is based on your continuing and deliberate refusal to comply with the QHR Code of Conduct and applicable company policies, and with your own written agreement to comply with such policies.  Your conduct has impeded

6

> QHR's ability to comply with the letter and intent of its own policies and of
> agreements to which both you and QHR are subject.  Your behavior also is
> insubordinate.  We also note that your conduct likely violates policies of Monroe
> County Medical Center.

QHR asserts that it received a copy of the *qui tam* complaint in January of 2005.  Thompson joined the National Guard on February 28, 2005, for a one year period, during which he served in Iraq.  Following his return, Thompson received a letter dated July 28, 2006, which informed him that QHR had terminated his employment.  This letter stated:

> Following your suspension and further efforts by QHR to obtain your cooperation
> in its investigation, and based upon your failure to comply with the Code of
> Conduct or to cooperate in QHR's investigation, QHR determined that it had no
> option but to terminate your employment.  While your termination was being
> processed, you informed QHR that the National Guard had called you to active
> duty.  Given you activation for military service, QHR decided that it would halt
> further processing of your termination and grant your request for military leave in
> accordance with its policy and practice.  Upon your return from military service,
> you were reinstated to the same position you occupied prior to going on military
> leaver which in this case was a suspended pay status.

Thompson filed this action on October 25, 2006, alleging that QHR terminated him in violation of the anti-retaliation provision of the False Claims Act, 31 U.S.C. § 3729 *et seq*.  Both parties have now moved for summary judgment.

**STANDARD**

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"[N]ot every issue of fact or conflicting inference presents a genuine issue of material fact." *Street v. J. C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989).  The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case.  *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996).  The plaintiff must present more than a mere scintilla of evidence in support of his position; the plaintiff must present evidence on which the trier of fact could reasonably find for the plaintiff.  *See id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).  Mere speculation will not suffice to defeat a motion for summary judgment: "the mere existence of a colorable factual dispute will not defeat a properly supported motion for summary judgment.  A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Moinette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1177 (6th Cir. 1996).

## DISCUSSION

The False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq.*, operates "to encourage any individual knowing of Government fraud to bring that information forward." *Yuhasz v. Brush Wellman, Inc.*, 341 F.3d 559, 562 (6th Cir. 2003) (citations omitted).  Section 3730(h) prevents employers from discriminating or terminating employees because of an employee's lawful participation in furtherance of an action under the FCA.  31 U.S.C. § 3730(h); *Moore v. California Inst. of Tech. Jet Propulsion Lab.*, 275 F.3d 838, 845 (9th Cir. 2002) ("The False Claims Act protects 'whistle blowers' from retaliation by their employers.").  Plaintiff must establish three things to make out a claim for retaliatory discharge under the FCA:

> (1) he engaged in protected activity; (2) his employer knew that he engaged in the protected activity; and (3) his employer discharged or otherwise discriminated against the employee as a result of the protected activity.

8

*Yuhasz*, 341, F.3d at 566.  The third part of the claim follows the *McDonnell Douglas* burden-shifting framework, common to Title VII retaliation claims.  *Scott v. Metropolitan Health Corp.*, 234 Fed. Appx. 341, 346, 2007 WL 1028853, **2 (6ᵗʰ Cir. 2007).  The employer must offer a legitimate, non-discriminatory reason for the employee's termination, which the employee must then refute by demonstrating pretext.  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973).

   "A plaintiff will usually demonstrate pretext by showing that the employer's stated reason for the adverse employment action either (1) has no basis in fact, (2) was not the actual reason, or (3) is insufficient to explain the employer's action."  *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 393 (6ᵗʰ Cir. 2008).  Plaintiff may demonstrate pretext by other means as well, such as challenging the "reasonableness of the employer's decision 'to the extent that such an inquiry sheds light on whether the employer's proffered reason for the employment action was its actual motivation.'"  *Risch v. Royal Oak Police Dept.*, 581 F.3d 383, 391 (6ᵗʰ Cir. 2009) (quoting *White*, 533 F.3d at 393 (internal citations omitted)).   "'[M]ere conjecture that [the] employer's explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment.'"  *Peters v. Lincoln Elec. Co.*, 285 F.3d 456, 470 (6ᵗʰ Cir. 2002) (quoting *Carney v. Cleveland Heights-Univ. Heights City School Dist.*, 758 N.E.2d 234, 245 (Ohio Ct. App. 2001)).

## I.     Employee Engaged in Protected Activity

   Plaintiff's first hurdle is to prove that he was engaged in protected activity.  Protected activity includes "lawful acts done by the employee . . . on behalf of the employee . . . or associated others in furtherance of other efforts to stop [one] or more violations" of the FCA.  31

9

U.S.C. § 3730(h)(1).  To be considered protected activity, "it is sufficient that a plaintiff be investigating matters that 'reasonably could lead' to a viable False Claims Act case."  *United States ex. rel. Yesudian v. Howard Univ.*, 153 F.3d 731, 740 (D.C. Cir. 1998).  A plaintiff's protected activity must, therefore, pertain to fraudulent claims.  *McKenzie v. BellSouth Telecomm., Inc.*, 219 F.3d 508, 514 (6th Cir. 2000).  Although an employee's conduct need not lead to an actual FCA action, protection under the FCA is limited to claims where litigation is reasonable and could be legitimately filed.  *Lang v. Northwestern Univ.*, 472 F.3d 493, 494-95 (7th Cir. 2006) ("[E]mployees who use reports of fraud to better their own position, or who behave like Chicken Little, impose costs on employers without advancing any of the goals of the False Claims Act." (quoting *Neal v. Honeywell Inc.*, 33 F.3d 860, 864 (7th Cir. 1994))).

There is no genuine issue of material fact that Plaintiff was engaged in protected activity. Plaintiff investigated what he believed was a fraudulent act by Defendant.  As part of his investigation, he gathered documents, spoke to attorneys, and eventually filed a *qui tam* action. At the time he was terminated, the *qui tam* action was still pending.  The fact that the *qui tam* action was later voluntarily dismissed with prejudice does not affect the Court's analysis, since employees need not bring successful *qui tam* actions in order to receive protection under the FCA.  There is no evidence that Plaintiff's claim was not brought in good faith, nor that it was unreasonable.  Therefore, the Court finds that Plaintiff has satisfied this prong of the FCA retaliation claim analysis.

## II.    Employer Knew that Employee Engaged in Protected Activity

For the second part of Plaintiff's claim, Plaintiff must establish that Defendant had actual or constructive knowledge of his protected activity.  *Schuhardt v. Washington Univ.*, 390 F.3d

10

563, 568 (8th Cir. 2004). "An employee must supply sufficient facts from which a reasonable jury could conclude that the employee was discharged because of activities which gave the employer reason to believe that the employee was contemplating a *qui tam* action against it." *McKenzie*, 219 F.3d at 517 (internal citations omitted). Therefore, the employer must have been placed on notice that the employee was engaging in protected activity. *Id.* at 518.

At the time of Plaintiff's suspension and his later discharge, there is no genuine issue of material fact that Defendant knew of Plaintiff's protected activity. Plaintiff was suspended on December 27, 2004. Prior to that date, Defendant had received two letters which referenced the *qui tam* lawsuit. The first was a November 5, 2004, letter sent by Plaintiff's attorney to QHR's in-house counsel. This letter referenced 31 U.S.C. § 3730(h) and asserted that Plaintiff was protected under that provision. Section 3730(h) is the anti-retaliation provision of the False Claims Act. Section 3730's title is "Civil actions for false claims." The rest of the statute describes *qui tam* actions and the rights of the parties. The second letter was sent by the Assistant United States Attorney to QHR's in-house counsel on November 29, 2004. This letter specifically stated that Plaintiff had filed a *qui tam* lawsuit under the False Claims Act. Defendant's counsel acknowledged receipt of this letter and its contents when it responded on December 15, 2004 – twelve days before Plaintiff was suspended. Therefore, it is clear that Defendant knew of Plaintiff's protected activity (in that he filed a *qui tam* lawsuit) prior to taking any adverse employment action.

**III.    Employer Discharged Employee as a Result of the Protected Activity**

The third part of Plaintiff's claim requires evidence that the adverse employment action taken by Defendant "was motivated, *at least in part*, by the employee's engaging in protected

11

activity." *McKenzie*, 219 F.3d at 514 n. 4 (emphasis added).  There is no direct evidence of

retaliatory intent in this case, so the *McDonnell Douglas* burden-shifting analysis applies.  *See*

*Weigel v. Baptist Hosp. of East Tennessee*, 302 F.3d 367, 381 (6th Cir. 2002).  Defendant must

offer a legitimate, non-discriminatory reason for Plaintiff's termination.  If such a reason can be

shown, the burden shifts to Plaintiff to demonstrate pretext.

      Defendant's proffered legitimate, non-discriminatory reason for suspending and later

terminating Plaintiff is that Plaintiff violated the terms of the Code of Conduct and breached his

duty to QHR and MCMC.  Defendant bases this argument on Plaintiff's signed

acknowledgments from 1999 to 2004, in which he agreed to abide by the terms of the Code of

Conduct.  However, he failed to report his suspicions of fraud to QHR or MCMC, as was

required by the Code.  Even after Plaintiff reported his suspicions of fraud in the audit

questionnaire, he thereafter refused to meet with any QHR officials to discuss his concerns.

Defendant asserts that this refusal was in violation of Plaintiff's duty as an employee and was

insubordinate.  Defendant alleges that Plaintiff's failure to cooperate resulted in a strained

relationship between QHR and MCMC's Board, wasted time and money on behalf of QHR in its

attempts to investigate without any additional information from Plaintiff, and prevented QHR

from taking appropriate steps to deal with the fraud allegations long before the *qui tam* lawsuit

was filed.  In addition, Defendant maintains that it warned Plaintiff repeatedly of the potential

consequences of Plaintiff's refusal to cooperate, including the possibility of termination.

Defendant further asserts that the reason Plaintiff's suspension was later turned into a

termination is because Defendant did not learn until January of 2005, after Plaintiff had already

been suspended, that Plaintiff had filed the *qui tam* lawsuit just thirteen days before he signed an

acknowledgment stating he would comply with the Code of Conduct. This additional information was enough for Defendant to determine that Plaintiff had deliberately committed too many violations to allow him to remain CEO of MCMC.

The Court finds that Defendant has presented a legitimate, non-discriminatory reason for the adverse employment actions taken against Plaintiff. Defendant had specific policies in place to deal with suspicions by employees of fraud and other violations of the law. Employees were required to abide by the Code of Conduct, and signed acknowledgments that they agreed to do so. Plaintiff signed these acknowledgments annually. The fact that he violated the Code is a legitimate reason for adverse employment action. *See Sybrandt v. Home Depot, U.S.A., Inc.*, 560 F.3d 553, 558 (6th Cir. 2009). Therefore, in order to prevent summary judgment granted in favor of Defendant, Plaintiff must present evidence that demonstrates that Defendant's legitimate, non-discriminatory reasons for taking adverse employment action are merely pretext.

Plaintiff must demonstrate that the employer's proffered reason was not the actual reason, is not based in fact, or is insufficient to explain the employer's action. *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 393 (6th Cir. 2008). Plaintiff cannot argue that there is no basis in fact for the Defendant's actions. He was obligated to report under the Code of Conduct and did not do so. However, the Court believes that Plaintiff has presented a genuine issue of material fact as to whether Defendant's legitimate, non-discriminatory reason was not the actual reason, or is an insufficient reason. First, Plaintiff asserts that John Taylor, the auditor, called him a "whistleblower," although Taylor denied making such a statement in his deposition. Further, there is disagreement between the parties as to when Defendant first knew that Plaintiff was involved in a *qui tam* action – either Defendant was alerted by the letter from Plaintiff's

counsel citing 31 U.S.C. § 3730(h) on November 5, 2004, or Defendant found out through the letter from the Assistant U.S. Attorney on November 29, 2004.  The timing is key to determining if Plaintiff's suspension or termination was ever contemplated prior to Defendant's knowledge of the *qui tam* action.  In addition, the general temporal proximity of the adverse employment action to Defendant's knowledge of the *qui tam* action may present further evidence of pretext.  Although temporal proximity "cannot alone prove pretext, . . . [it] can be used an [sic] 'indirect evidence' to support an employee's claim of pretext."  *Asmo v. Keane, Inc.*, 471 F.3d 588, 598 (6th Cir. 2006).

Finally, Plaintiff asserts that Defendant did not do any further investigation or consideration of its decision between the time Plaintiff was suspended and the time he was terminated.  Defendant argues that they received the *qui tam* complaint after Plaintiff was suspended, and found out he had signed an acknowledgment just days after filing the complaint.  Defendant says learning of this additional violation of the Code was the final straw that resulted in Plaintiff's termination.  However, the Court fails to see how Defendant would not have already known about this violation at the time it learned of the *qui tam* action, despite not having a copy of the complaint.  Clearly, Plaintiff had filed the complaint while he was under the employ of Defendant.  Further, he was obligated under the Code to report to Defendant year-round, not just at the time he signed an acknowledgment, so the importance of the timing of Plaintiff's signing of the acknowledgment seems to have been exaggerated.

The Court finds that a genuine issue of material fact exists as to the issue of pretext, and therefore, summary judgment must be denied.

14

**CONCLUSION**

For the foregoing reasons, **IT IS HEREBY ORDERED** that Plaintiff's Motion for

Summary Judgment is **DENIED**, and Defendant's Motion for Summary Judgment is **DENIED**.