UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
BOWLING GREEN DIVISION
CASE NO. 1:06-CV-168

**MARK THOMPSON**                                                                       **PLAINTIFF**

v.

**QUORUM HEALTH RESOURCES, LLC**                                        **DEFENDANT**

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court upon Defendant's Motion to Exclude Evidence Concerning *Qui Tam* Lawsuits Filed Against Defendant (Docket #106), Defendant's Motion to Preclude Plaintiff from Introducing Evidence of Punitive Damages (Docket #107), Plaintiff's First Motion in Limine to Exclude Evidence: Government's Decision Not to Intervene in Underlying *Qui Tam* (Docket #117), and Plaintiff's Second Motion in Limine to Exclude Evidence: Draft Audit Questionnaire (Exhibit 2 to Chris Kelly Deposition) (Docket #118). Plaintiff has responded (Docket #124). Defendant has responded (Docket #125, 126). The Court held a telephonic status conference on January 8, 2010. This matter is now ripe for adjudication. For the following reasons, Defendant's Motion to Exclude Evidence Concerning *Qui Tam* Lawsuits Filed Against Defendant is GRANTED IN PART and DENIED IN PART; Defendant's Motion to Preclude Plaintiff from Introducing Evidence of Punitive Damages is GRANTED; Plaintiff's First Motion in Limine is GRANTED; and Plaintiff's Second Motion in Limine is DENIED.

**BACKGROUND**

Plaintiff Mark Thompson was an employee of Defendant Quorum Health Resources, LLC ("QHR") from 1994 to 2006. He was first hired as the chief executive officer ("CEO") of Cumberland County Hospital in Burkesville, Kentucky, in 1994. In 1999, Thompson accepted

the position of CEO at Monroe County Medical Center ("MCMC") in Tompkinsville, Kentucky. He worked there as an at will employee until he was terminated on July 28, 2006. QHR is a healthcare management company that contracts with independent hospitals' Boards of Trustees to provide hospital management services. QHR typically hires a CEO and chief financial officer ("CFO") to oversee the business and financial operations of those hospitals. The CEO and CFO are accountable to QHR, the Board, and the hospital.

While serving as CEO of MCMC, Thompson grew concerned over QHR's control of decisions normally reserved to hospital boards, including the selection of vendors. Thompson believed that QHR chose vendors that would benefit QHR, while increasing costs for the individual hospitals. In 2001, QHR made the decision to change the Group Purchasing Organization for the hospital from Premier to Healthtrust Purchasing Group. Thompson questioned QHR's assertions that the hospital would save significant amounts of money. Thompson sought the advice of attorney Greg Stivers, who suggested he look into a *qui tam* action. After hiring a private attorney and speaking to federal authorities, Thompson filed a *qui tam* lawsuit, under seal, on January 14, 2004. He did not inform MCMC or QHR that he filed this lawsuit.

In May of 2004, Thompson received an audit questionnaire from John Taylor of the accounting firm of Taylor Polson & Company. Taylor's firm performed annual audits for MCMC, and routinely gave audit questionnaires to management personnel. On August 4, 2004, Thompson returned the audit questionnaire to Taylor. His answers indicated that he had suspicions of fraud within the company. QHR officials made several efforts to meet with Thompson to discuss his answers to the questionnaire, but that meeting never took place. During

2

this time, QHR was informed of Thompson's *qui tam* action.

On December 27, 2004, Thompson was suspended with pay, for failing to comply with his basic job duties and insubordination. Thompson joined the National Guard on February 28, 2005, for a one year period, during which he served in Iraq. Following his return, Thompson received a letter dated July 28, 2006, which informed him that QHR had terminated his employment. Thompson filed this action on October 25, 2006, alleging that QHR terminated him in violation of the anti-retaliation provision of the False Claims Act, 31 U.S.C. § 3729 *et seq*. Both parties now seek to exclude evidence. Each motion is addressed in turn below.

## DISCUSSION

### I. *Qui Tam* Lawsuits

Defendant seeks to preclude the introduction of evidence concerning any prior *qui tam* lawsuits filed against Defendant. Defendant asserts that these prior *qui tam* actions are irrelevant to the present case. Plaintiff wishes to offer evidence of the underlying *qui tam* action and a 2001 *qui tam* settlement. Plaintiff argues that the underlying *qui tam* action should be admissible because it is "inextricably intertwined with the protected conduct for which Defendant retaliated against him." The Court finds that the underlying *qui tam* action filed by Plaintiff is relevant and admissible.

According to Plaintiff, as a result of the 2001 *qui tam* settlement, Defendant was operating under a corporate integrity agreement with the United States government. As part of that agreement, Defendant agreed to refrain from engaging in fraudulent or illegal activity for five years. Any violation of that agreement within its effective time period would have resulted in "substantial fines and penalties." Plaintiff alleges that this evidence is probative to the

3

motivation of Defendant to retaliate against him for filing his *qui tam* complaint.

Even if evidence is relevant it may be excluded "if its probative value is substantially outweighed by the danger of undue prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." Fed. R. Evid. 403. "District courts are given broad discretion in making a Rule 403 determination." *United States v. Bonds*, 12 F.3d 540, 567 (6th Cir. 1993). "Unfair prejudice does not mean the damage to a [party]'s case that results from the legitimate probative force of the evidence; rather it refers to evidence which tends to suggest [a] decision on an improper basis." *United States v. Newsom*, 452 F.3d 593, 603 (6th Cir. 2006) (quoting *Bonds*, 12 F.3d at 567). The Court believes that specific reference to the 2001 *qui tam* settlement may be highly prejudicial to Defendant and confusing to the jury. However, the probative value of the corporate integrity agreement and the enhanced penalty provision to Plaintiff's case outweighs this prejudice to an extent. Therefore, the Court finds that Plaintiff shall only inquire as to the corporate integrity agreement and its enhanced penalties. Plaintiff may not refer to the origin of the agreement, the fact that it was a *qui tam* settlement, or the facts of the 2001 case. Plaintiff shall notify the Court and opposing counsel prior to questioning any witness about the agreement and enhanced penalties.

**II.     Punitive Damages**

Defendant moves to preclude Plaintiff from seeking punitive damages for his retaliation claim. The anti-retaliation provision of 31 U.S.C. § 3730 provides for various forms of relief. These include "reinstatement with the same seniority status that employee . . . would have had but for the discrimination, 2 times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including

litigation costs and reasonable attorneys' fees." 31 U.S.C. § 3730(h)(2). Punitive damages are not listed as a form of relief under the statute. Plaintiff has agreed to stipulate to the fact that punitive damages are not available. Therefore, Defendant's motion is granted.

### III.     Government's Decision Not to Intervene in Underlying Action

Plaintiff must establish three things to make out a claim for retaliatory discharge under the False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq.*:

> (1) he engaged in protected activity; (2) his employer knew that he engaged in the protected activity; and (3) his employer discharged or otherwise discriminated against the employee as a result of the protected activity.

*Yuhasz v. Brush Wellman, Inc.*, 341 F.3d 559, 566 (6th Cir. 2003). Protected activity includes "lawful acts done by the employee . . . on behalf of the employee . . . or associated others in furtherance of other efforts to stop [one] or more violations" of the FCA. 31 U.S.C. § 3730(h)(1). To be considered protected activity, "it is sufficient that a plaintiff be investigating matters that 'reasonably could lead' to a viable False Claims Act case." *United States ex. rel. Yesudian v. Howard Univ.*, 153 F.3d 731, 740 (D.C. Cir. 1998). A plaintiff's protected activity must, therefore, pertain to fraudulent claims. *McKenzie v. BellSouth Telecomm., Inc.*, 219 F.3d 508, 514 (6th Cir. 2000). "[T]he protected conduct element of such a claim does not require the plaintiff to have developed a winning *qui tam* action before he is retaliated against." *Yesudian*, 153 F.3d at 739. "Under the whistleblower statute, 'an employee engages in protected activity where (1) the employee in good faith believes, and (2) a reasonable employee in the same or similar circumstances might believe, that the employer is possibly committing fraud against the government.'" *Wilkins v. St. Louis Housing Auth.*, 314 F.3d 927, 933 (8th Cir. 2002) (quoting *Moore v. Cal. Inst. of Tech. Jet Propulsion Lab.*, 275 F.3d 838, 845 (9th Cir. 2002)).

"Determining what activities constitute "protected conduct" is a fact specific inquiry." *Hutchins v. Wilentz, Goldman & Spitzer*, 253 F.3d 176, 187 (3d Cir. 2001). Therefore, in order to prove the first element of his prima facie case, Plaintiff must introduce evidence related to the underlying *qui tam* action. The facts presented must be enough for the jury to determine if Plaintiff was acting in good faith and if a reasonable person in Plaintiff's position would have believed that the employer was possibly committing fraud against the government. However, the fact that the government chose not to intervene is not a necessary fact for Plaintiff's case, nor does it serve to prove that Plaintiff did not engage in protected activity. *See Yesudian*, 153 F.3d at 739.

Plaintiff seeks to exclude evidence of the government's decision as irrelevant. Therefore, Defendant must provide a relevant reason for introduction of the government's refusal to intervene in the underlying *qui tam* action if the Court is to deny Plaintiff's motion. Defendant offers three reasons for introduction of the evidence. First, Defendant argues that Plaintiff has put the underlying *qui tam* action at issue, and therefore, the government's decision is directly relevant. The Court has addressed this argument in the above paragraph. In order to prove his case, Plaintiff must be allowed to introduce evidence of the underlying *qui tam* action, but the outcome is irrelevant to that issue. Therefore, this argument fails. Defendant's second argument is that Plaintiff's plan to introduce evidence of the result of the 2001 *qui tam* action directly contradicts his argument that the outcome of the underlying *qui tam* action should be excluded. The Court believes that these are two distinct issues, and Defendant's argument fails to present a proper basis for admissibility.

Finally, Defendant asserts that the government's decision is relevant to refute Plaintiff's

accusations that Defendant did not cooperate with the government in its investigation, and because Plaintiff has alleged that Defendant terminated him in order to prevent Plaintiff from cooperating with the government. Defendant's brief states, "Thompson cannot argue that Quorum was motivated to terminate him to avoid a government investigation (and act as if that investigation did not occur with Quorum's cooperation) but seek to exclude the results of that very governmental investigation." The Court finds that the government's decision not to intervene may have been based on a variety of factors, so it is not necessarily probative to this issue. Further, the evidence is likely to mislead or confuse the jury. Therefore, the Court believes that the prejudicial effect of introducing the government's decision not to intervene outweighs any probative value. Plaintiff's motion is granted.

## IV. Draft Audit Questionnaire

Plaintiff seeks to exclude a draft audit questionnaire that was presented by Plaintiff's counsel at Chris Kelly's deposition. This draft questionnaire was prepared by Plaintiff for discussion with his private counsel. Plaintiff then submitted an edited questionnaire to the auditor. Plaintiff contends that the draft audit questionnaire is protected by attorney-client privilege, and Plaintiff's counsel inadvertently disclosed the questionnaire at the deposition that took place on February 13, 2009.

Federal Rule of Evidence 502 provides that when an inadvertent disclosure is made, the disclosure is not construed as a waiver if "the holder of the privilege or protection took reasonable steps to prevent disclosure . . . and the holder promptly took reasonable steps to rectify the error . . . ." Fed. R. Evid. 502(b)(2), (3). In this case, Plaintiff's counsel failed to take reasonable steps to prevent disclosure and rectify his mistake. Any attorney-client privilege that

7

attached to the draft audit questionnaire was effectively waived by Plaintiff's counsel when he introduced it at the deposition, used it in his questioning of the deponent, and made a copy for Defendant's counsel. The fact that Plaintiff's counsel failed to file a motion to exclude the document until ten months after the deposition heightens the failure of Plaintiff's counsel to take reasonable steps to protect the privileged document. Therefore, the draft audit questionnaire is admissible and Plaintiff's motion is denied.

## CONCLUSION

For the foregoing reasons, IT IS HEREBY ORDERED that Defendant's Motion to Exclude Evidence Concerning *Qui Tam* Lawsuits Filed Against Defendant is GRANTED IN PART and DENIED IN PART; Defendant's Motion to Preclude Plaintiff from Introducing Evidence of Punitive Damages is GRANTED; Plaintiff's First Motion in Limine to Exclude Evidence: Government's Decision Not to Intervene is GRANTED; and Plaintiff's Second Motion in Limine to Exclude Evidence: Draft Audit Questionnaire is DENIED.